IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-745

Filed 7 January 2026

Wake County, No. 25CV004705-910

JOSHUA H. STEIN, in his official capacity as GOVERNOR OF THE STATE OF
NORTH CAROLINA, Plaintiff,

v.

DESTIN C. HALL, in his official capacity as SPEAKER OF THE NORTH CAROLINA
HOUSE OF REPRESENTATIVES; PHILIP E. BERGER, in his official capacity as
PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE, Defendants.


Cross appeals by plaintiff and defendants from order entered 24 June 2025 by

Judges James Floyd Ammons, Jr.; A. Graham Shirley; and Imelda J. Pate in Wake

County Superior Court. Heard in the Court of Appeals 28 October 2025.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jim W. Phillips, Jr., Eric Fletcher, Amanda S. Hawkins, and Daniel F. E. Smith, and Wilmer, Cutler, Pickering, Hale & Dorr LLP, by W. Swain Wood, for the plaintiff-appellant.*

*Nelson Mullins Riley & Scarborough, LLP, by D. Martin Warf, Noah H. Huffstetler, III, and Womble Bond Dickinson (US) LLP, by Matthew F. Tilley, Mike Ingersoll, and Emmett Whelan for the defendant-appellants.*

*Dowling PLLC, by Craig D. Schauer and Troy D. Shelton, for the intervenor-appellee.*

TYSON, Judge.


Joshua H. Stein, in his official capacity as Governor of the State of North

Carolina and Philip E. Berger, in his official capacity as President *Pro Tempore* of the

North Carolina Senate and Destin C. Hall, in his official capacity as Speaker of the North Carolina House of Representatives (collectively "Legislative Defendants") appeal from the 24 June 2025 order entered by a three-judge superior court panel.

The order granted in part and denied in part the motions for summary judgment filed by the Governor, the State Treasurer, and the Legislative Defendants. We affirm in part, reverse in part, and remand.

## I. Background

The North Carolina General Assembly enacted N.C. Sess. L. 2024-49 and N.C. Sess. L. 2024-57, which amended N.C. Gen. Stat. § 143-136 and N.C. Gen. Stat. § 62-10. N.C. Gen. Stat. §§ 143-136; 62-10 (Supp. 2024). These amendments altered the structures of and appointments to the Building Code Council and the Utilities Commission respectively.

Senate Bill 382 amended N.C. Gen. Stat. § 163-9 ("Judicial Vacancies Provision"), which provides for the appointment and filling of appellate judicial vacancies on the Court of Appeals and the Supreme Court. N.C. Sess. L. 2024-57 § 3C.1.(a). This section mandates for the Governor to fill appellate judicial vacancies on the Court of Appeals and the Supreme Court "from a list of three qualified persons recommended by the political party executive committee of the political party with which the vacating judge was affiliated when elected." N.C. Gen. Stat. § 163-9 (Supp. 2024). If no recommendation is received within thirty (30) days or if the departing appellate judge or justice was not a member of a political party at the time of election,

the Governor "shall appoint a qualified person to fill the vacancy." *Id.*

The Governor filed a verified complaint on 7 February 2025 in Wake County Superior Court, seeking a declaratory judgment and arguing: Section 3C.1 of Senate Bill 382 facially violates Article IV, Section 19 of the North Carolina Constitution; Section 3F.2 of Senate Bill 382 and Senate Bill 166 facially violate Article I, Section 6 the Separation of Powers Clause, Article III, Section 1, the Vesting Clause, and Article III, Section 5(4), the Faithful Execution Clause, of the North Carolina Constitution.

The Governor filed a motion for a temporary restraining order, preliminary injunction, and for transfer of the cause to a three-judge panel for hearing under N.C. Gen. Stat. § 1-267.1 (2023). The Legislative Defendants filed their answer on 22 April 2025. The superior court granted the Governor's motion to transfer the case to a three-judge panel on 24 April 2025. The Chief Justice of North Carolina assigned the panel of three superior court judges to hear the case.

Bradford B. Briner, in his official capacity as State Treasurer of North Carolina, intervened and filed a motion for summary judgment on 30 May 2025. The Governor and the Legislative Defendants also filed motions for summary judgment on 30 May 2025. The three-judge panel held a hearing on the cross motions for summary judgment on 24 June 2025. The panel unanimously held the Governor proved beyond a reasonable doubt the purported amendments to N.C. Gen. Stat. § 163-9 in Section 3C.1 of Session Law 2024-57, the Judicial Vacancies Provision, are

unconstitutional. The three-judge panel granted the Governor's motion for summary judgment and denied the Legislative Defendants' motion for summary judgment on this issue.

The three-judge superior court panel also unanimously held the Governor had not proven beyond a reasonable doubt N.C. Sess. L. 2024-49, which amended N.C. Gen. Stat. § 143-136, the Building Code Council, and N.C. Sess. L. 2024-57, which amended N.C. Gen. Stat. § 62-10, the Utilities Commission, were unconstitutional. The panel denied the Governor's motion for summary judgment and granted the Legislative Defendants' motion for summary judgment on these issues. The summary judgment order did not mention the State Treasurer's motion for summary judgment on the Utilities Commission challenge, resolved in his favor. The Governor and the Legislative Defendants cross appeal.

## II. Jurisdiction

This Court has jurisdiction pursuant to N.C. Gen. Stat. § 7A-27(b) (2023).

## III. Issues

The Governor argues the three-judge superior court panel erred by denying his motion for summary judgment challenging the Building Code Council and Utilities Commission. The Legislative Defendants argue the three-judge superior court panel erred in denying their motion for summary judgment to uphold the Judicial Vacancies amendments.

## IV. Standard of Review

North Carolina Rule of Civil Procedure 56(c) allows a moving party to obtain summary judgment upon demonstrating "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show "there is no genuine issue as to any material fact," and they are "entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023).

"The party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact." *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citation omitted). "This burden may be met by proving . . . an essential element of the opposing party's claim is nonextant, or by showing through discovery . . . opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense[,] which would bar the claim." *Id.* (citation and internal quotation marks omitted). An order granting summary judgment is reviewed *de novo* on appeal. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004).

We also review *de novo* a three-judge superior court panel's ruling on state constitutional questions. *Cooper v. Berger*, 370 N.C. 392, 413, 809 S.E.2d 98, 110-11 (2018). "When assessing a challenge to the constitutionality of legislation, this Court's duty is to determine whether the General Assembly has complied with the constitution. If constitutional requirements are met, the wisdom of the legislation is a question for the General Assembly." *Hart v. State*, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

"In performing our task, we begin with a presumption that the laws duly enacted by the General Assembly are valid." *Id.* The three-judge panel properly concluded, "a law will be declared invalid only if its unconstitutionality is demonstrated beyond reasonable doubt." *Id.*

Our Supreme Court has held, when interpreting our State's Constitution: "provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption." *State v. Webb*, 358 N.C. 92, 94, 591 S.E.2d 505, 509 (2004). "To ascertain the intent of those by whom the language was used, we must consider the conditions as they existed and the purpose sought to be accomplished." *Id.*

## V. Facial Challenge

The Governor's declaratory judgment action is admittedly a facial challenge and our review is strictly limited to that basis. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 443, 192 L. Ed. 2d 435, 443 (2015). Facial challenges are "the most difficult challenge to mount" successfully. *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707 (1987).

"[A] plaintiff must establish that a law is unconstitutional in all of its applications." *Patel*, 576 U.S. at 418, 192 L.E.2d at 445 (citation and internal quotation marks omitted). "In a facial challenge, the presumption [before the trial court and on appeal] is . . . the law is constitutional, and a court may not strike it

down if it may be upheld on any reasonable ground." *Affordable Care, Inc. v. N.C. State Bd. of Dental Exam'rs*, 153 N.C. App. 527, 539, 571 S.E.2d 52, 61 (2002).

## VI. Building Code Council and Utilities Commission

Our Supreme Court has issued three recent precedents interpreting the separation of powers clause under the North Carolina Constitution: *State ex rel. McCrory v. Berger*, 368 N.C. 633, 781 S.E.2d 248 (2016); *Cooper v. Berger*, 370 N.C. 392, 809 S.E.2d 98 (2018); *Cooper v. Berger*, 371 N.C. 799, 822 S.E.2d 286 (2018) ("*Cooper Confirmation*"). We review each in turn.

### A. State ex rel. McCrory v. Berger

In *McCrory*, the Governor challenged the General Assembly's enactment of and appointments under the Energy Modernization Act and the Coal Ash Management Act of 2014. *See* N.C. Gen. Stat. §§ 143B-290-293-6; 130 A-309.20-309.231 (2014). The Energy Modernization and the Coal Ash Management Act of 2014 created three administrative commissions: the Oil and Gas Commission; the Mining Commission; and, the Coal Ash Management Commission. *Id.*

The Oil and Gas Commission is housed within the Department of Environmental and Natural Resources ("DENR"), and it "has the power to promulgate rules, make determinations, and issue orders consistent with the Oil and Gas Conservation Act." *McCrory*, 368 N.C. at 636-37, 781 S.E.2d at 251 (citation omitted) (DENR was renamed Department of Environmental Quality, however, "[b]ecause the Energy Modernization Act and the Coal Ash Management Act predate

this name change . . . , we will continue to use this superseded name."). Nine members comprise the Oil and Gas Commission: three appointed by the Governor and six appointed by the General Assembly. *Id.* at 637, 781 S.E.2d at 251 (citation omitted).

The Mining Commission is also housed within DENR. *Id.* (citation omitted). It "has the power to promulgate mining rules and affirm, modify or overrule permit decisions that DENR makes." *Id.* The Mining Commission "has eight members: two appointed by the Governor; four appointed by the General Assembly; the chair of the North Carolina State University Minerals Research Laboratory Advisory Committee; and the State Geologist, who is ex officio and nonvoting." *Id.*

"The Coal Ash Management Commission is administratively located in the Division of Emergency Management of the Department of [Public] Safety but is expressly required to exercise its powers and duties 'independently,' without 'the supervision, direction, or control of the Division or Department.'" *Id.* (citation omitted). The Coal Ash Management Commission "has the power to review and approve coal ash surface impoundment classifications and closure plans that DENR proposes" and "has nine members: three appointed by the Governor and six appointed by the General Assembly." *Id.* (citations omitted).

The Governor can remove any member of all three commissions for "malfeasance, misfeasance, or nonfeasance." *Id.* at 637-38, 781 S.E.2d at 251. The Governor challenged the provisions, which allowed the General Assembly to appoint members to the commissions under both Article III, Section 5(8) the appointments

clause and Article I, Section 6, the separation of powers clause.

Chief Justice Martin, writing for the majority of the Court, addressed the constitutional tension between the legislative and executive branches: "The Governor's power to appoint officers under the [appointments clause] continues to extend only to constitutional officers" and "does not prohibit the General Assembly from appointing statutory officers to administrative commissions." *Id.* at 644, 781 S.E.2d at 255.

The Court's majority opinion then turned to the separation of powers arguments and clause, laying out an analytical framework, that is used to accomplish the task of determining "we must determine whether the actions of a coordinate branch 'unreasonably disrupt a core power of the executive.'" *Id.* at 645, 781 S.E.2d at 256 (citing *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2021)). Article III, Section 5(4) of the North Carolina Constitution requires and mandates "the Governor [to] have enough control over the board or commission that" is "primarily administrative or executive in character" "to perform" its "constitutional duty." *Id.* at 645-46, 781 S.E.2d at 256. The Supreme Court's majority opinion further noted the General Assembly "insulate[d] the Coal Ash Management Commission from executive branch control even more by requiring the Commission to exercise its powers and duties 'independently,' without the' supervision, direction or control of the Division of Emergency Management or Department of Public Safety." *Id.* at 646, 781 S.E.2d at 257.

Unlike in *State ex rel. Wallace v. Bone*, 304 N.C. 591, 286 S.E.2d 79 (1982), the Supreme Court in *McCrory* did not create a bright line rule:

> We cannot adopt a categorical rule that would resolve every separation of powers challenge to the legislative appointment of executive officers. Because each statutory scheme will vary the degree of control that legislative appointment provisions confer on the General Assembly, we must resolve each challenge by carefully examining its specific factual and legal context. While the General Assembly's ability to appoint an officer obviously does not give it the power to control what that officer does, we must examine the degree of control that the challenged legislation allows the General Assembly to exert over the execution of the laws.

*McCrory*, 368 N.C. at 646-47, 781 S.E.2d at 257.

In *Wallace*, the Supreme Court had considered a separation of powers challenge to a law appointing four sitting legislators to the Environmental Management Commission. *Wallace*, 304 N.C. at 606-07, 286 S.E.2d 79, 87 (1982). The General Assembly had created the cabinet-level Environmental Management Commission, whose responsibilities are "promulgat[ing] rules and regulations for air quality standards, emission control standards, and classifications for air contaminant sources . . .; for water quality standards and classifications . . . ; to issue permits for water use within capacity areas; and for the protection of sand dunes[.]" *Id.* at 607-08, 286 S.E.2d at 88. The Court, in *Wallace*, held the Environmental Management Commission functions and duties were "administrative or executive in character." *Id.* at 608, 286 S.E.2d at 88. The Court further held the General Assembly "cannot create

a special instrumentality of government to implement specific legislation and then retain some control over the process of implementation by appointing legislators to the governing body of the instrumentality." *Id.* This *per se* rule prohibits one branch of government from exercising powers, which are vested exclusively in another branch. This prohibition was violated by sitting legislators creating and appointing themselves to the Commission and wielding executive power. The Court held it was "crystal clear" the Environmental Management Commission's duties are "administrative or executive in character." *Id.*

The Court's majority in *McCrory*, further held: "As a part of the inquiry in this case, we must also consider whether the General Assembly has 'retain[ed] some control' over the executive branch's functions." *McCrory*, 368 N.C. at 646, 781 S.E.2d at 257 (citing *Wallace*, 304 N.C. at 608, 286 S.E.2d at 88). The sufficiency of the Governor's "degree of control" "[d]epends on his [or her] ability to appoint the commissioners, to supervise their day-to-day activities and to remove them from office." *Id.* at 646, 781 S.E.2d at 256.

The Supreme Court of North Carolina applied the above framework and held in *McCrory*:

> Using that approach here, we hold that the challenged appointment provisions violate the separation of powers clause. When the General Assembly appoints executive officers that the Governor has little power to remove, it can appoint them essentially without the Governor's influence. That leaves the Governor with little control over the views and priorities of the officers that the General Assembly

> appoints. When those officers form a majority on a commission that has the final say on how to execute the laws, the General Assembly, not the Governor, can exert most of the control over the executive policy that is implemented in any area of the law that the commission regulates. As a result, the Governor cannot take care that the laws are faithfully executed in that area. The separation of powers clause plainly and clearly does not allow the General Assembly to take this much control over the execution of the laws from the Governor and lodge it with itself.

*Id.* at 647, 781 S.E.2d at 257 (citations omitted).

The Court's majority opinion in *McCrory* specifically declined to address "how the separation of powers clause applies to those executive departments that are headed by the independently elected members of the Council of State." *Id.* at 646 n.5, 781 S.E.2d at 256 n.5.

### B. *Cooper v. Berger*

Two years after *McCrory*, the Supreme Court decided another separation of powers case in *Cooper v. Berger.* 370 N.C. at 395, 809 S.E.2d at 99. The General Assembly had enacted Senate Bill 4 and House Bill 17, which abolished the separate State Board of Elections and State Ethics Commission and appointed the existing members of the State Board of Elections to a newly created Bipartisan State Board of Elections and Ethics Enforcement. *Id.* The General Assembly consolidated both boards' powers into the Bipartisan State Board of Elections and Ethics Enforcement. *Id.* After examining the political question and standing doctrines, the majority's opinion examined the Governor's argument asserting Senate Bill 4 and House Bill 17

"unconstitutionally infringe on the Governor's executive powers in violation of separation of powers." *Id.* at 413, 809 S.E.2d at 110 (alteration omitted).

The Supreme Court in *Cooper* applied the analytical framework from *McCrory*. The Court acknowledged its decision in *McCrory* did not define "control." *Id.* at 414, 809 S.E.2d at 111. The Bipartisan State Board of Elections and Ethics Enforcement "performs primarily executive, rather than legislative or judicial functions." *Id.* at 415, 809 S.E.2d at 112. The Bipartisan State Board of Elections and Ethics Enforcement consists of "eight members appointed by the Governor, four of whom must be members of the political party with the highest number of registered affiliates selected from a list of nominees provided by the chair of the party in question and four of whom must be members of the political party with the second highest number of registered affiliates selected from a list of nominees provided by the chair of the party in question." *Id.* (citation omitted).

The majority's opinion concluded the creation of the Bipartisan State Board of Elections and Ethics Enforcement "leave[s] the Governor with little control over the views and priorities . . . by requiring that a sufficient number of its members to block the implementation of the Governor's policy preferences and selected from a list of nominees chosen by the leader of the political party other than the one to which the Governor belongs" which "limit[s] the extent to which individuals supportive of the Governor's policy preferences have the ability to supervise the activities," thereby "significantly constraining the Governor's ability to remove members." *Id.* at 416,

809 S.E.2d at 112-13.

### *C. Cooper Confirmation*

The same year as the Supreme Court of North Carolina decided *Cooper*, it also decided another separation of powers case in *Cooper Confirmation*. *Cooper Confirmation*, 371 N.C. at 801, 822 S.E.2d 290.

In *Cooper Confirmation*, the Governor challenged the appointments provision of N.C. Gen. Stat. § 143-9(a) under the separation of powers clause and the appointments clause, which granted the North Carolina Senate the power to confirm the Governor's nominees to serve in his cabinet, who head as secretaries the eleven statutorily created administrative departments. *Id.* The Court noted the Governor "is the Chief Executive Officer of the State." *Id.* at 802, 822 S.E.2d at 290. "Cabinet members must provide the Governor with extensive information about the work of their respective departments." *Id.* The Governor can remove any member of their cabinet for any reason. *Id.*

Chief Justice Martin, writing for the Court's majority, as he had in *McCrory*, applied the *McCrory* analysis: "the degree of control that the Governor has over executive officers can be measured by considering 'his ability to appoint [them], to supervise their day-to-day activities, and to remove them from office.'" *Id.* at 806, 822 S.E.2d at 293. The Court's majority held "senatorial confirmation curtails the Governor's appointment power only minimally." *Id.* at 807, 822 S.E.2d at 294. The Governor can nominate any eligible person he or she wants. *Id.* The General

Assembly "granted the Senate some piece of the appointment power" through confirmation, however, "the Governor retains the most important role in the process: the ability to choose, from the universe of all eligible people, the person on whom the Senate will have an up-or-down vote." *Id.* at 807-08, 822 S.E.2d at 294.

Chief Justice Martin's opinion distinguished the facts at hand from the earlier *Cooper* case, where the choice was from "two short lists" prepared "by the state party chair[s] of the two political parties with the highest number of registered affiliates." *Id.* (citation omitted). The Court noted the Governor's ability to control the views and priorities of cabinet members, and held "the Governor has extensive supervisory power, allowing him to directly manage his Cabinet members in virtually every aspect of their authority." *Id.* at 808, 822 S.E.2d at 294-95.

Finally, the Court noted the Governor retained the sole and "plenary authority to remove the members of his Cabinet." *Id.* at 809, 822 S.E.2d at 295. The Court held senatorial confirmation of Cabinet nominees does not violate the separation of powers clause. *Id.*

### D. Stein v. Berger

On the day oral argument was originally scheduled in this case, this Court released its opinion in *Stein v. Berger*, __ N.C. App. __, __ S.E.2d __, 2025 LX 415164 (2025) ("*Stein Commissions*"). In *Stein Commissions*, a prior panel of this Court examined Senate Bill 512 and House Bill 488, which restructured the membership and composition of seven state boards and commissions: (1) the Board of

Transportation; (2) the Economic Investment Committee; (3) the Commission for Public Health; (4) the Environmental Management Commission; (5) the Coastal Resources Commission; (6) the Wildlife Resources Commission; and, (7) the Building Code Council. N.C. Sess. Laws 2023-136, 2023-108.

The Governor argued the General Assembly's restructuring of the above boards and commissions violated the separation of powers clause of Article I, Section 6 of the North Carolina Constitution. This Court reasoned:

> Separation of powers is one of the "'fundamental principles on which state government is constructed . . . .'" The separation of powers clause of the North Carolina Constitution mandates that the "legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." "[I]n other words, each branch is directed to perform its assigned duties and avoid encroaching on the duties of another branch."

> The North Carolina Constitution also provides that the "Governor shall take care that the laws be faithfully executed." But "the Governor is not alone in this task." In addition to the Governor, nine elected officers "assist the executive branch in fulfilling its purpose," including the: Lieutenant Governor, Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of Agriculture, Commissioner of Labor, and Commissioner of Insurance. Together, the Governor and the nine executive officers comprise the Council of State. As a result, "the Governor's duty to 'take care that the laws be faithfully executed' . . . is a nonexclusive duty conferred upon all ten Council of State members."

> When a branch is accused of violating separation of powers by encroaching upon the executive branch's authority, we

consider whether the accused branch's actions "'unreasonably disrupt a core power of the executive.'" Such action generally occurs when the accused branch "'retains some control' over the executive branch's functions." There is, however, no "categorical rule that would resolve every separation of powers challenge" because "each statutory scheme" varies. Consequently, "we must resolve each challenge by carefully examining its specific factual and legal context." Separation of powers violations, therefore, can be "more nuanced" and occur "when the actions of one branch prevent another branch from performing its constitutional duties."

*Id.* at __, __ S.E.2d at __, 2025 LX 415164, at *6-8 (internal citations omitted).

Judge Murry, concurring in full, but writing a separate concurrence, noted the non-unitary nature of the Executive Branch: "Article III divides our Executive Branch's powers among the plural Council of State, with the Governor chief among them." N.C. Const. art III, § 1-2, 7-8." *Id.* at __, __ S.E.2d at __, 2025 LX 415164, at *25 (Murry, J., concurring).

House Bill 488 took duties belonging to the Building Code Council and assigned them to the Residential Code Council. HB 488, § 1(a). The Residential Code Council is housed within the Department of Insurance. *Id.* The Commissioner of Insurance is a statewide elected Council of State member. The Residential Code Council consists of thirteen members: seven are appointed by the Governor and six are appointed by the General Assembly. *Id.* The Governor selects the chair and the chair assigns members to committees. The Residential Code Council requires nine members to take action and to form a quorum to conduct business. *Id.*

This Court unanimously held:

> By restructuring the BCC in this manner, the Governor controls the majority and the chair, who controls the composition of committees. While the change in size and voting structure does not guarantee the Governor total control over the RCC's actions, the Governor nonetheless retains "enough control" because his appointed members constitute seven of the nine members required for the quorum. *See McCrory*, 368 N.C. at 646, 781 S.E.2d at 256; *Cooper Confirmation*, 371 N.C. at 800, 822 S.E.2d at 289-90. Given the quorum requirement, it is not as though the General Assembly's six appointed members can take action without the approval of at least three of the Governor's appointed members. As the General Assembly did not violate separation of powers, the panel did not err by concluding that the restructuring of the BCC was constitutional.

*Stein Commissions*, __ N.C. App. at __, __ S.E.2d at __, 2025 LX 415164, at *23.

### E.  Building Code Council

Here, the Governor argues the restructuring of the Building Code Council's quorum and voting requirements violated the separation of powers clause by depriving the Governor of his constitutionally sufficient control over the Council. In *Stein Commissions*, this Court addressed the same issue with respect to the Residential Code Council.

Both the Supreme Court of North Carolina and this Court have long recognized "[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." *In re Civil Penalty*, 324 N.C. 373,

384, 379 S.E.2d 30, 37 (1989). We are bound by this Court's holding in *Stein Commissions*. The Governor, in his supplemental brief on the impact of *Stein Commissions*, "recognizes the constitutional issues before this panel with respect to the Building Code Council are nearly identical to those addressed by the *Stein Commissions* panel with respect to the Residential Code Council. Accordingly, the Governor acknowledges this Court is now bound by panel precedent for purposes of resolving that aspect of this appeal." The Governor has also filed a response to the Legislative Defendants' petition for discretionary review before the Supreme Court requesting that Court to deny further review of *Stein Commissions*. *Id.*

The three-judge panel did not err in denying the Governor's motion for summary judgment and granting the Legislative Defendants' motion for summary judgment on the restructuring of the Building Code Council. *Id.*

## F. Utilities Commission

The Governor argues Senate Bill 382 deprives the Governor of constitutionally sufficient control over the Utilities Commission. The Governor asserts Senate Bill 382 fails the "enough control" test the Supreme Court articulated in *McCrory*. *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256. The Governor further asserts the State Treasurer and the Governor are not "fungible." He argues the General Assembly cannot reassign one Council of State member's core constitutional duties to another. When the General Assembly is able to reassign functions within the Council of State, Article III, Section 11 of the North Carolina Constitution requires the functions to be

grouped together "according to major purposes." Finally, the Governor asserts Senate Bill 382 functionally gives the General Assembly *de facto* control of the State Treasurer's appointment to the Commission.

The Utilities Commission is composed of five members. N.C. Gen. Stat. § 62-10 (2023). Prior to the enactment of Senate Bill 382, the Governor was authorized to appoint three members and designate the chair. *Id.* The Legislative Defendants were authorized to appoint two members. *Id.* Senate Bill 382 transferred one of the Governor's three (3) appointments to the State Treasurer. N.C. Sess. L. 2024-57, § 3F.1(a).

The Governor asserts he is denied sufficient control over the Utilities Commission, citing *McCrory*. "[T]he Governor must have enough control over [the commissions] to perform his constitutional duty." *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256. However, in *McCrory*, the Supreme Court did not address "how the separation of powers clause applies to those executive departments that are *headed by the independently elected members of the Council of State*." *Id.* (emphasis supplied).

The Governor maintains he "has little, possibly no authority to remove Commissioners." The Public Utilities Act provides "[m]embers of the Commission shall be liable to impeachment for the causes and in the manners provided for judges." N.C. Gen. Stat. § 62-10(i) (2023). This removal provision is not changed by Senate Bill 382, and it is instead governed by the Public Utilities Act. *Id.* This argument is

without merit.

The Utilities Commission is "declared to be an administrative board or agency of the General Assembly." N.C. Gen. Stat. § 62-23 (2023). Our General Statutes further provide: "The [Utilities] Commission shall separate its administrative or executive functions, its rulemaking function, and its functions judicial in nature to such extent as it deems practical and divisible in the public interest." *Id.*

In *Stein Commissions*, this Court held, "[w]hile the Governor does not directly appoint a majority of each commission, the executive branch holds the majority appointment power." *Stein Commissions*, __ N.C. App. at __, __ S.E.2d at __, 2025 LX 415164, at *21. This Court in *Stein Commissions* held elected members of the Council of State, specifically, the Commissioner of Agriculture and Commissioner of Insurance, could make appointments to the Coastal Resources Commission, the Environmental Management Commission, and the Wildlife Resources Commission. *Id.* This Court held the General Assembly could restructure these commissions because the "executive branch holds the majority appointment power." *Id.*

The requisite analysis and issue, as Judge Murry further articulated in detail in his concurrence, was not whether the Governor alone appoints the majority, but whether *the executive branch* makes the majority of appointments. "[T]he Governor's duty to take care that the laws be faithfully executed . . . is a nonexclusive duty conferred upon all ten Council of State members." *Id.* (citation and internal quotation marks omitted).

Here, the Governor and the State Treasurer appointees hold the majority appointment power. The Governor asserts the General Assembly cannot reassign one Council of State member's core constitutional duties to another. Article III, Section 11 of the North Carolina Constitution provides:

> Not later than July 1, 1975, all administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law among and within not more than 25 principal administrative departments so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department.

N.C. Const. art III, § 11.

This section does not address the allocation of duties between Council of State members. The Governor asserts the State Treasurer's role does not revolve or resolve around the regulation of public utilities, citing Justice Dietz's separate concurrence in an order denying the Governor's petition for a writ of *supersedeas* and a petition for writ of *certiorari* and also dismissing the Governor's motion for a temporary stay in a challenge to the General Assembly's alteration of the structure and oversight of the State Board of Elections. *Stein v. Berger*, 387 N.C. 575, 575, 915 S.E.2d 146, 146 (2025). Justice Dietz wrote:

> In addition to each Council of State member's core constitutional roles, the General Assembly has long assigned other executive duties to each Council of State member that are related to that member's core functions. The authority to do so comes from the constitutional provisions authorizing the General Assembly to reorganize

- 22 -

> the executive branch however it sees fit, so long as administrative functions and duties are grouped together "as far as practicable according to major purposes." N.C. Const. art. III, §§ 5(10), 11.

*Id.* at 581-82, 915 S.E.2d at 150 (Dietz, J., concurring).

Article III, Section 5(10) grants the General Assembly the power to "prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time[.]" N.C. Const. art III, § 5(10) ("Administrative reorganization. The *General* Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may abolish and/or alter them from time to time, but the Governor may make such changes in the allocation of offices and agencies and in the allocation of those functions, powers, and duties as he considers necessary for efficient administration. If those changes affect existing law, they shall be set forth in executive orders, which shall be submitted to the General Assembly not later than the sixtieth calendar day of its session, and shall become effective and shall have the force of law upon adjournment *sine die* of the session, unless specifically disapproved by resolution of either house of the General Assembly or specifically modified by joint resolution of both houses of the General Assembly." (emphasis supplied)).

The General Assembly holds the residual power of the People as their elected representatives and has made a choice. After the constitutional mandate, giving the General Assembly the right to reorganize State administrative departments by 1975,

the Constitution expressly gives them the right to modify the departments functions, powers, and duties "from time to time." N.C. Const. art III, § 5(10).

The Governor argues and asserts Senate Bill 382 functionally gives the General Assembly control because of the ability to confirm. As our Supreme Court emphasized in *Cooper Confirmation*, the Governor has the power to appoint "all *constitutional* officers whose appointments are not otherwise provided for in the constitution." *Cooper Confirmation*, 371 N.C. at 805, 822 S.E.2d at 292 (citation omitted). The General Assembly can appoint and confirm statutory officers. *Id.* "[A]ppointing statutory officers is not an exclusively executive prerogative." *Id.* The "lesser power to confirm statutory officers is not vested in either branch." *Id.* Upon *de novo* review, the order of the three-judge superior court panel upholding the State Treasurer's appointment to the Utilities Commission is affirmed.

## VII. Judicial Vacancies

The Legislative Defendants argue the three-judge superior court panel erred by granting the Governor's motion for summary judgment and denying their motion for summary judgment by holding the amendments to N.C. Gen. Stat. § 163-9 in Section 3C.1 of Session Law 2024-57 were facially unconstitutional.

This section provides:

SUBPART III-C. JUDICIARY

> MODIFY THE APPOINTMENT PROCESS TO FILL SUPREME COURT AND COURT OF APPEALS VACANCIES

SECTION 3C.1.(a)  G.S. 163-9 reads as rewritten:

"§ 163-9.  Filling vacancies in State and district judicial offices.

"**§ 163-9.  Filling vacancies in State and district judicial offices.**
    (a)        ~~Vacancies~~ The Governor shall appoint persons to fill vacancies occurring in the offices of Justice of the Supreme ~~Court,~~ Court and judge of the Court of ~~Appeals, and judge of the superior court~~ Appeals for causes other than expiration of term ~~shall be filled by appointment of the Governor.~~ from a list of three qualified persons recommended by the political party executive committee of the political party with which the vacating judge was affiliated when elected. If a political party fails to make recommendations under this subsection within 30 days of the occurrence of the vacancy, or if a vacating judge was not affiliated with a political party at the time of the judge's election, the Governor shall appoint a qualified person to fill the vacancy. For purposes of this subsection, a qualified person is a person who is a resident of the State who is duly authorized to practice law in this State. An appointee to the office of Justice of the Supreme Court or judge of the Court of Appeals shall hold office until January 1 next following the election for members of the General Assembly that is held more than 60 days after the vacancy occurs, at which time an election shall be held for an eight-year term and until a successor is elected and qualified.

N.C. Sess. L. 2024-57, § 3C.1.(a).

### A.  Baker v. Martin

The Supreme Court of North Carolina examined an amendment to N.C. Gen. Stat. § 7A-142, which governs the appointment of vacancies in the district court in *Baker v. Martin*, 330 N.C. 331, 410 S.E.2d 887 (1991).  The challenged statute provided:

> A vacancy in the office of district judge shall be filled for the unexpired term by appointment of the Governor from nominations submitted by the bar of the judicial district. . . . If the district court judge was elected as the nominee of a political party, then the district bar shall submit to the

> Governor the names of three persons who are residents of the district court district who are duly authorized to practice law in the district and who are members of the same political party as the vacating judge[.]

*Id.* at 334, 410 S.E.2d at 889.

The plaintiff, an otherwise qualified candidate but who affiliated with the Republican Party, attended the district bar meeting convened to nominate three candidates for the departing registered Democrat judge's seat. The plaintiff was not considered for the slate of three candidates submitted, because his party affiliation was different from that of the departing judge. *Id.* at 333, 410 S.E.2d at 888. The plaintiff argued "certain provisions of the North Carolina Constitution set the qualifications for appointment to the office of district court judge and, by placing the additional qualification on candidates that they be members of the same political party as the vacating judge, N.C.G.S. § 7A-142 violate[d] the Constitution." *Id.* at 334, 410 S.E.2d at 889.

Our Supreme Court interpreted Article V, Section 6 to apply only to "'election to office' . . . rather than to appointment to an 'elective office.'" *Id.* at 336, 410 S.E.2d at 890. The Supreme Court further examined Article VI, Section 8, holding it "does not necessarily imply that additional disqualifications cannot be added by the General Assembly for those persons not elected by the people. Instead, N.C. Const. art VI, § 8 merely enumerates three disqualifications, one of which applies only to offices filled by election by the people." *Id.* at 339, 410 S.E.2d at 892.

The Court then examined the plaintiff's challenges under Article IV, Sections 10 and 19. The Court's majority opinion rejected the plaintiff's argument Article IV, Section 10 "provides for the creation of district courts and that vacancies on the district court bench shall be filled 'in a manner prescribed by law.'" *Id.* at 340, 410 S.E.2d at 892-93. The plaintiff asserted Article IV, Section 10 "prescribes the manner in which district court judges are appointed and nowhere in this section does it say that a person must be of a certain political party to be eligible for appointment as a district court judge." *Id.*

The Court's majority held "[t]he phrase 'in a manner prescribed by law' appears in two places in N.C. Const. art IV, § 10." *Id.* *See* N.C. Const. art IV, § 10 ("The General Assembly shall, from time to time, divide the State into a convenient number of local court districts and shall prescribe where the District Courts shall sit, but a District Court must sit in at least one place in each county. District Judges shall be elected for each district for a term of four years, *in a manner prescribed by law*. When more than one District Judge is authorized and elected for a district, the Chief Justice of the Supreme Court shall designate one of the judges as Chief District Judge. Every District Judge shall reside in the district for which he is elected. For each county, the senior regular resident Judge of the Superior Court serving the county shall appoint from nominations submitted by the Clerk of the Superior Court of the county, one or more Magistrates who shall be officers of the District Court. The initial term of appointment for a magistrate shall be for two years and subsequent terms shall be

for four years. The number of District Judges and Magistrates shall, from time to time, be determined by the General Assembly. Vacancies in the office of District Judge shall be filled for the unexpired term *in a manner prescribed by law*. Vacancies in the office of Magistrate shall be filled for the unexpired term in the manner provided for original appointment to the office, unless otherwise provided by the General Assembly." (emphasis supplied).

The phrase "in a manner prescribed by law" "appears in that part of the section providing for the election of judges and that part of the section providing for the appointment of judges. It follows that the identical words used in the same section must have an identical meaning." *Baker*, 330 N.C. at 340, 410 S.E.2d at 892-93.

The Court's majority concluded the use of the phrase "in a manner prescribed by law" "means that the General Assembly must play some part. The complicated procedure governing elections is not set forth in the Constitution." *Id.* at 341, 410 S.E.2d at 893. The Court's majority noted: "The General Assembly in this case has chosen to protect the mandate of the previous election by providing that the appointed judge should be of the same political party as his or her predecessor." *Id.*

The Court's majority opinion cited the Supreme Court of the United States' opinion in *Rivera-Rodriguez v. Popular Democratic Party*, although it acknowledged the case had interpreted the Constitution of the United States instead of the North Carolina Constitution, 457 U.S. 1, 72 L. Ed. 2d 628 (1982). That case held: "it did not violate the United States Constitution for Puerto Rico to protect the mandate of the

people by requiring a legislator to be of the same political party as his or her deceased predecessor." *Id.* The Supreme Court's opinion recognized *Rivera-Rodriguez* "does illustrate that the protection of the mandate of an election is a legitimate concern." *Id.*

The majority's opinion then addressed the plaintiff's argument the political party membership was an unconstitutional qualification for office. The plaintiff cited: *Starbuck v. Havelock*, 252 N.C. 176, 113 S.E.2d 278; *Cole v. Sanders*, 174 N.C. 112, 93 S.E. 476 (1917); *Spruill v. Bateman*, 162 N.C. 588, 77 S.E. 768 (1913); and, *State of N.C. by the At. Gen'l, Hargrove, ex rel. Lee v. Dunn*, 73 N.C. 595 (1875). Our Supreme Court overruled this argument by distinguishing the above cases as "election to office cases and not appointment to office." *Id.* at 341-42, 410 S.E.2d at 893. The Court upheld the statute's political party requirement. *Id.*

The Legislative Defendants assert our Supreme Court's holding in *Baker* supports their position, asserting the Court found a similar design did not violate Article IV, Section 19. In *Baker*, as examined above, the Supreme Court upheld a requirement that the Governor must appoint a member of the same political party as the departing judge. The General Assembly, as within its right and power, later amended N.C. Gen. Stat. § 7A-142 in 1999 to remove the challenged requirement in *Baker*. 1999 HB. 168.

Our Supreme Court has not repudiated or overruled its analysis in *Baker* either expressly or implicitly. This Court is bound by the analysis in *Baker*. *See*

*Cannon v. Miller*, 313 N.C. 324, 324, 327 S.E.2d 888, 888 (1985) (noting the Court of Appeals' "responsibility to follow th[e] decisions [of the Supreme Court of North Carolina], until otherwise ordered by the Supreme Court").

Section 3C.1 further provides the Governor "shall appoint" "from a list of three qualified persons recommended by the political party with which the vacating judge was affiliated when elected." The Governor asserts the provisions "transfers the core of the appointment power from the Governor to unrelated political operatives."

In *Baker*, as here, the Governor was free to select any member of the political party who was included in the district bar's list of three nominees. The Governor was required to appoint someone from the district bar's list of three nominees, who otherwise met the qualifications and requirements for office. The statutes still require the list of potential judicial appointees to be generated by a body outside of the Governor's control.

The state executive political party committees and other local political party leaders and committees are mentioned extensively in Chapter 163 to nominate individuals for appointment by the Governor to fill vacancies in both federal and state legislative offices. *See* N.C. Gen. Stat. § 163-11 (2023) ("[T]he Governor shall immediately appoint for the unexpired part of the term [in the General Assembly] the person recommended by the political party executive committee provided by this section. The Governor shall make the appointment within seven days of receiving the recommendation of the appropriate committee. If the Governor fails to make the

appointment within the required period, he shall be presumed to have made the appointment and the legislative body to which the appointee was recommended is directed to seat the appointee as a member in good standing for the duration of the unexpired term."); N.C. Gen. Stat. § 163-12 (2023) ("If the [United States] Senator was elected as the nominee of a political party, the Governor shall appoint from a list of three persons recommended by the State executive committee of the political party with which the vacating member was affiliated when elected if that party executive committee makes recommendations within 30 days of the occurrence of the vacancy.").

The Governor argues and asserts the power to appoint is the ability to "select his nominees from a virtually unlimited pool of qualified people." *Cooper Confirmation*, 371 N.C. at 808, 822 S.E.2d at 294. This language refers to the ability of the Governor to select a nominee of his choice, who must be confirmed by the Senate to his Cabinet. The Governor wields substantial power over his Cabinet. *Id.* The Supreme Court held "Cabinet members are some of the Governor's closest deputies, and are critical to the Governor's ability to take care that the laws be faithfully executed." *Id.* at 807, 822 S.E.2d at 294. "In short, the Governor has extensive supervisory power, allowing him to directly manage his cabinet members in virtually every aspect of their authority," and the Cabinet members "serve at the Governor's pleasure." *Id.* at 808, 822 S.E.2d at 295 (citation omitted).

In *Cooper*, the Supreme Court rejected the statutory framework in which the

Governor had to choose an equal number of his appointees from two short lists prepared "by the State party chair[s] of the two political parties with the highest number of registered affiliates." *Cooper*, 370 N.C. at 396, 809 S.E.2d at 101. However, the Bipartisan State Board of Elections and Ethics Enforcement "performs primarily executive, rather than legislative or judicial functions." *Id.* at 415, 809 S.E.2d at 112.

The Governor asserts "Article IV, Section 19 specifically prohibits the legislature from imposing any limits on the Governor's appointment authority beyond those found in Article IV itself." This assertion is patently incorrect based upon the plain language of the Supreme Court in *Baker*. *Baker* expressly addresses vacancy appointments in Article IV, Section 19, holding "N.C. Const. art IV, § 19 *does not govern exclusively* the appointment of district court judges." *Baker*, 330 N.C. at 341, 410 S.E.2d at 893 (emphasis supplied).

In *Baker*, the Supreme Court of North Carolina rationalized and held the phrase "in a manner prescribed by law" grants the General Assembly "some part to play" in the appointment of judges. *Id.* The Governor's argument is overruled.

## VIII.   Conclusion

The General Assembly did not violate the separation of powers clause by restructuring the Building Code Council and Utilities Commission in Senate Bill 382. The three-judge superior court panel correctly granted the Legislative Defendants' and the State Treasurer's motions for summary judgment and correctly denied the

Governor's motion for summary judgment.

The General Assembly did not violate the separation of powers clause by requiring the Governor to appoint appellate judges "from a list of three qualified persons recommended by the political party executive committee of the political party with which the vacating judge was affiliated when elected." N.C. Sess. L. 2024-57, § 3C.1.(a); *Baker*, 330 N.C. at 341, 410 S.E.2d at 893. The three-judge superior court panel erred as a matter of law by granting the Governor's motion for summary judgment and denying the Legislative Defendants' motion for summary judgment.

The order of the three-judge superior court panel is affirmed in part, reversed in part, and remanded with instructions to grant the Legislative Defendants' motion for summary judgment and to deny the Governor's motion for summary judgment. *It is so ordered.*

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judge ZACHARY concurs.

Judge COLLINS concurs in part and dissents in part with separate opinion.

COLLINS, Judge, concurring in part and dissenting in part.

I concur in the majority opinion addressing the Building Code Council as we are bound by *Stein Commissions* for purposes of resolving that aspect of this appeal. For the reasons stated herein, I respectfully dissent from the majority opinion addressing the Utilities Commission and appellate judicial vacancies.

## IX. Utilities Commission

### B. Background

Before Senate Bill 382, the Governor was authorized to appoint three of the Commission's five members and designate the Commission's chair. N.C. Gen. Stat. § 62-10. The General Assembly was authorized to appoint the remaining two Commissioners. *Id.* Commissioners were "liable to impeachment for the causes and in the manners provided for judges . . . ." *Id.* § 62-10(i).

With Senate Bill 382, the General Assembly transferred one of the Governor's appointments to the State Treasurer. N.C. Sess. Laws 2024-57, § 3F.1.(a) (amending N.C. Gen. Stat. § 62-10(a)). The Governor's appointees and the Treasurer's appointee remain subject to confirmation by the General Assembly. N.C. Gen. Stat. § 62-10(a). The Treasurer is independently elected and not subject to appointment or removal by the Governor. N.C. Const. art. III, § 7(1); N.C. Gen. Stat. § 147-4. The Governor and the Treasurer have no authority to remove any appointee; Commissioners remain removable only by impeachment, *id.* § 62-10(i).

Senate Bill 382 also eliminates the Governor's authority to appoint the Commission's chair. Instead, the chair is now selected by a majority of the Commissioners. N.C. Sess. Laws 2024-57 § 3F.1.(a). The chair is "the chief executive and administrative officer of the Commission." N.C. Gen. Stat. § 62-13(a). The chair decides whether matters are heard by the full Commission or a panel of three Commissioners and dictates the composition of any such panels; rules on procedural motions and petitions; and may unilaterally initiate investigations, complaints, or any other proceedings. *Id.* §§ 62-13(b)-(d).

## C. Analysis

The Utilities Commission is "an administrative board or agency" that was "created for the principal purpose of carrying out the administration and enforcement of" the Public Utilities Act. N.C. Gen. Stat. § 62-23. It investigates utilities, issues certificates of public convenience, and approves transfers of franchises. *Id.* §§ 62-34, 62-37, 62-110, 62-111. These are quintessential executive tasks. *See Stein v. Berger*, 2025 N.C. App. LEXIS 727, *8 ("*Stein Commissions*"). Because the Commission is an executive agency, the Governor must retain "enough control" over the Commission to ensure that it faithfully executes the law. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 646 (2016); N.C. Const. art. III, § 5(4) ("The Governor shall take care that the laws be faithfully executed."). The degree of control that the Governor has over the Commission "depends on his ability to appoint the commissioners, to supervise their day-to-day activities, and to remove them from office." *McCrory*, 368 N.C. at 646.

Under Senate Bill 382, the Governor appoints two of five Commissioners, the General Assembly appoints two, the General Assembly gives the remaining appointment to the State Treasurer, and the chair is chosen by a majority of the Commissioners. And neither the Governor nor the Treasurer may remove their appointees from office. The majority opinion concludes that this structure is constitutional because the Governor and the State Treasurer together hold the majority appointment power. I disagree for three independent reasons.

First, the Treasurer's appointment is not wholly an exercise of executive power; it exists only because the General Assembly gave it to him, and the General Assembly may take it away. The General Assembly's asserted authority to reassign appointments among Council of State members at any time, including immediately after an election, for any reason, or no reason at all, gives the General Assembly the power to determine which executive official controls the swing vote on the Commission, including the swing vote on the selection of the chair. This creates the separation-of-powers danger that *McCrory* forbids: legislative dominance over the execution of the laws. *Id.* at 646-47.

Second, the Treasurer's appointment bears no relationship to the Treasurer's constitutional role. The Constitution requires that duties assigned to Council of State members be "sufficiently related" to a "major purpose" of the member's "core constitutional role." *Stein v. Berger*, 387 N.C. 575, 582 (2025) (Dietz, J., concurring); *see* N.C. Const. art. III, §§ 5(10), 11. The Treasurer's core constitutional role concerns

the custody, accounting, and management of State funds. *See* N.C. Const. art. V, § 7 (requiring an "accurate account of the receipts and expenditures of State funds" to be "published annually"); *see also Cooper v. Berger*, 376 N.C. 22, 43 (2020) (describing Article V, § 7 as the "definition[] of the . . . State Treasurer found in the State constitution"). None of the Treasurer's duties relate to utilities regulation. Assigning the Treasurer a decisive appointment to the Utilities Commission violates the "major purpose" doctrine. It also undermines democratic accountability: voters elect the Treasurer to manage the State's finances, not to regulate public utilities.

Third, *McCrory* requires the Governor to control agencies housed in Cabinet departments. *McCrory*, 368 N.C. at 646. The Utilities Commission is housed within the Department of Commerce, a principal department under N.C. Gen. Stat. § 143B-9. *See* N.C. Gen. Stat. §§ 143B-6(9), -431(a)(2)(b), -433(1)(b). Under *McCrory*, such departments "unquestionably fall under the Governor's purview." *McCrory*, 368 N.C. at 646 n.5.

The majority treats *Stein Commissions* as dispositive. But that case addressed different agencies, different statutory structures, and different constitutional concerns. Most importantly, it did not address: legislative manipulation of appointment authority immediately after an election; the constitutional requirement that duties assigned to Council of State members relate to their core functions; or *McCrory's* rule that agencies housed in principal departments must remain under

4

gubernatorial control. Because *Stein Commissions* did not resolve these issues, it does not bind us here.

For these reasons, I would hold that Senate Bill 382 is unconstitutional as it relates to the Utilities Commission. I would therefore reverse the three-judge panel's order granting summary judgment to Legislative Defendants and remand to the superior court to enter summary judgment to the Governor on this issue.

## X. Appellate Judicial Vacancies

### D. Background

Article IV of the North Carolina Constitution establishes the "General Court of Justice," divided into the Appellate, Superior Court, and District Court Divisions. N.C. Const. art. IV, §§ 1-2. The Appellate Division consists of the Supreme Court and Court of Appeals; justices and judges of those courts are chosen in statewide elections. *Id.* §§ 5, 16. Article IV, Section 19 governs the power to fill most judicial offices created in Article IV: "Unless otherwise provided in this Article, all vacancies occurring in the offices provided for by this Article shall be filled by appointment of the Governor." *Id.* § 19.

Various sections in Article IV "otherwise provide" different procedures for filling vacancies with respect to district court judges, special and emergency superior court judges, clerks of superior court, and magistrates. Vacancies in the office of district court judge "shall be filled for the unexpired term in a manner prescribed by law." *Id.* § 10. "The General Assembly may provide by general law for the selection

or appointment of special or emergency superior court judges . . . ." *Id.* § 9(1). Vacancies in the offices of clerk of superior court and magistrates are filled as specified in Section 9(3) and Section 10. *Id.* §§ 9(3), 10. No such "manner prescribed by law" language appears with respect to justices of the Supreme Court, judges of the Court of Appeals, or regular superior court judges.

Article IV also contains the constitutional qualifications for judicial office. The General Assembly "shall prescribe maximum age limits for service as a Justice or Judge" of the General Court of Justice. *Id.* § 8. And "[o]nly persons duly authorized to practice law in the courts of this State shall be eligible for election or appointment as a Justice or Judge" of the General Court of Justice. *Id.* § 22.

Consistent with Article IV, Section 19, North Carolina law has long provided that vacancies on the Supreme Court, Court of Appeals, and superior court "shall be filled by appointment of the Governor" without further statutory restriction on whom the Governor could appoint, beyond the constitutional requirements of age and licensure. *See* N.C. Gen. Stat. § 163-9 (prior to 2024 amendment).

In 2024, the General Assembly enacted Session Law 2024-57, Section 3C.1.(a) ("Judicial Vacancies Provision") which amended Section 163-9 to require the Governor to fill appellate court vacancies from a partisan list:

> The Governor shall appoint persons to fill vacancies
> occurring in the offices of Justice of the Supreme Court and
> judge of the Court of Appeals for causes other than
> expiration of term from a list of three qualified persons
> recommended by the political party executive committee of

6

> the political party with which the vacating judge was affiliated when elected. If a political party fails to make recommendations under this subsection within 30 days of the occurrence of the vacancy, or if a vacating judge was not affiliated with a political party at the time of the judge's election, the Governor shall appoint a qualified person to fill the vacancy. For purposes of this subsection, a qualified person is a person who is a resident of the State who is duly authorized to practice law in this State.

N.C. Sess. Laws 2024-57, § 3C.1.(a).

The issue before us is whether the Judicial Vacancies Provision impermissibly infringes on the Governor's appointment authority in Article IV, Section 19. A three-judge panel of superior court judges unanimously concluded that the Judicial Vacancies Provision is unconstitutional and enjoined its enforcement. I agree with the three-judge panel.

## E. Governing principles

To determine whether legislative acts conform to the Constitution, we look to constitutional text, structure, history, and precedent, always with the aim of effectuating the intent of the people who ratified the provision at issue. *Martin v. State*, 330 N.C. 412, 415-16 (1991). "The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected." *Id.* at 416 (quoting *State v. Emery*, 224 N.C. 581, 583 (1944)).

Our State Constitution is a limitation on, rather than a grant of, legislative power. *Cooper v. Berger*, 371 N.C. 799, 810 (2018) ("*Cooper Confirmation*"). "Unless

the Constitution expressly or by necessary implication restricts the actions of the legislative branch, the General Assembly is free to implement legislation as long as that legislation does not offend some specific constitutional provision." *Id.* at 811 (quoting *Baker v. Martin*, 330 N.C. 331, 338-39 (1991)). Nonetheless, when a legislative act "plain[ly] and clear[ly]" exceeds an express or necessarily implied constitutional limit, courts must declare it invalid. *McCrory*, 368 N.C. at 639.

With these principles in mind, I turn to the constitutional question presented.

## F. Analysis

### 1. Substantial displacement of the appointment power

As an initial matter, I reject Legislative Defendants' characterization of the Judicial Vacancies Provision as a modest regulation of "process" or "qualifications" that leaves the Governor's appointment power intact. It is more accurately characterized as a substantial displacement of the appointment power.

Under the Judicial Vacancies Provision, when a justice of the Supreme Court or a judge of the Court of Appeals who was elected as an affiliate of a political party vacates office, the executive committee of that political party selects three "qualified persons" and transmits that list to the Governor. *See* N.C. Sess. Laws 2024-57, § 3C.1.(a). The Governor must appoint one of those three people; he may not appoint any other eligible attorney in the State unless the party fails to submit a list within 30 days or the departing justice or judge was unaffiliated. *See id.*

Where the Constitution vests appointment power in the Governor, that power inherently includes the ability to select "from a virtually unlimited pool of qualified people" such that "the ultimate appointee will be a person that *he alone* has chosen." *Cooper Confirmation*, 371 N.C. at 808, 801 (emphasis added).

Here, the Judicial Vacancies Provision gives to a political party executive committee what the Supreme Court describes as the core substance of the appointment power: the power to choose from the pool of qualified people and to ensure that the ultimate appointee will be a person the Governor alone has chosen. *Id*. Under the Judicial Vacancy Provision, the political party executive committee–not the Governor–chooses which three individuals will be eligible for appointment. The Governor may conclude that each of the three is unqualified; he nonetheless must appoint one of them, so long as they satisfy the minimal constitutional prerequisites of age and bar membership. His "choice" is reduced to selecting the least objectionable of three individuals pre-screened by partisan actors.

Labeling this partisan-screening requirement a "qualification" does not transform it into one. A "qualification" for office ordinarily refers to "a quality or skill that fits a person (as for an office)." *Qualification*, Merriam-Webster (2025), https://www.merriam-webster.com/dictionary/qualification (last visited December 20, 2025). Being chosen by a political party executive committee is not a quality or skill that has any relationship to an individual's fitness to hold judicial office. The partisan-screening requirement is also, by design, a condition that can be satisfied by

9

no more than three people at any given time. And as Legislative Defendants conceded at oral argument, there is nothing to prevent the General Assembly from even further limiting its gatekeeping requirements. In their view, the Governor need only be given a "choice" of two candidates, chosen for reasons unrelated to fitness to hold judicial office, to satisfy constitutional requirements.

I therefore view the Judicial Vacancies Provision as a substantial displacement of the appointment power Article IV, Section 19 vests in the Governor, not a minor implementation of that power. Whether that displacement is constitutional turns on the meaning of Section 19.

## 2. *Plain text and structure*

Article IV, Section 19 provides, in pertinent part, "Unless otherwise provided in this Article, all vacancies occurring in the offices provided for by this Article shall be filled by appointment of the Governor." N.C. Const. art. IV, § 19. This provision provides the general rule that vacancies in "the offices provided for by this Article," referring to the judicial offices created in Article IV, "shall be filled by appointment of the Governor." *Id.* This clause identifies both the mechanism (appointment) and the officer (the Governor) responsible for filling vacancies.

The general rule is expressly subject to the prefatory clause, "Unless otherwise provided in this Article." *Id.* That clause specifies that exceptions to the general rule may be found in Article IV and nowhere else. Thus, the plain language of Section 19 requires vacancies in Article IV offices to be filled by gubernatorial appointment, and

10

any departure from the default rule, either as to the manner in which a vacancy is filled or who fills it, must be "otherwise provided in" Article IV. *Id.*

The structure of Article IV confirms this reading. Where the framers intended to permit the General Assembly to design the method of filling particular judicial vacancies, it said so explicitly. Section 9 authorizes the General Assembly to "*provide by general law* for the selection or appointment of special or emergency Superior Court Judges not selected for a particular judicial district." N.C. Const. art. IV, § 9(1) (emphasis added). Section 10 likewise provides that "[v]acancies in the office of District Judge shall be filled for the unexpired term *in a manner prescribed by law*," and that "[v]acancies in the office of Magistrate shall be filled for the unexpired term in the manner provided for original appointment to the office, *unless otherwise provided by the General Assembly*." *Id.* § 10 (emphases added). By contrast, for vacancies in the appellate courts and regular superior courts, the Constitution neither authorizes the General Assembly to prescribe the "manner" of filling those vacancies nor otherwise empowers it to constrain the Governor's choice of appointee. We generally presume that differences in constitutional text are purposeful and must be given effect. *See Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 863 (2018) (emphasizing significance of framers' choice of "shall" in one subsection and "may" in another).

Defendants contend that the phrase "[u]nless otherwise provided in this Article" functions only to acknowledge that Sections 9 and 10 allocate appointment

11

of special or emergency Superior Court judges, district court judges, and magistrates to other actors. But this narrow reading ignores its broader, limiting language. Section 19 does harmonize Sections 9 and 10, in that the Governor's appointment authority yields where Article IV provides "otherwise." Yet Section 19 also specifies that any deviation from the default rule, either as to the manner in which a vacancy is filled or who fills it, must be rooted in Article IV itself.

This construction is reinforced by *Baker v. Martin*. There, the Supreme Court considered a challenge to former North Carolina General Statute Section 7A-142, which required the Governor to appoint to district court vacancies a person of the same political party as the departing judge. *Baker*, 330 N.C. at 333-34. The plaintiff argued that this partisan requirement impermissibly added a new disqualification for office beyond those listed in Article VI, Section 8. *Id.* at 339. Section 8 provides, "The following persons shall be disqualified for office:" followed by an enumerated list of disqualifications. N.C. Const. art. VI, § 8.

The Court rejected that challenge, noting that Article VI, Section 8 does not contain language limiting disqualifications to those listed in the Constitution. *Id.* The Court explained:

> Had the framers wanted to limit the disqualifications to those outlined in N.C. Const. art. VI, § 8 and other constitutional provisions, they could have done so easily by rewriting the first sentence in N.C. Const. art. VI, § 8 to read: "Unless otherwise provided for in this Constitution, only the following persons shall be disqualified for office[.]"

*Id.* The Court treated "[u]nless otherwise provided for in this Constitution" as language that, if included in Article VI, Section 8, would have limited disqualifications to those listed in the Constitution and would have prohibited the General Assembly from adding more by statute.

Article IV, Section 19 employs materially similar language. It states that vacancies "shall be filled by appointment of the Governor" "[u]nless otherwise provided in this Article." N.C. Const. art. IV, § 19. While Section 19 does not include the word "only" that *Baker* used in its hypothetical re-drafting, the absence of that word is not dispositive. The Supreme Court in *Baker* held that the operative language in Article VI, Section 6, "Every qualified voter in North Carolina who is 21 years of age, except as in this Constitution disqualified, shall be eligible for election by the people to office," does limit the General Assembly's ability to add further disqualifications for elected office. *Id.* at 339. The limiting language is the clause directing that exceptions arise "in this Constitution," not from the word "only." Likewise, Article IV, Section 19 directs that exceptions to the gubernatorial appointment rule arise when "otherwise provided in this Article." Under *Baker's* reasoning, that phrase necessarily signals that any constraint on the Governor's exercise of the appointment power must be found in Article IV itself, not in ordinary legislation.

Defendants argue that *Baker* supports their position because the Court ultimately upheld the partisan requirement in Section 7A-142. But the Court did so

13

only after determining that Article IV, Section 19 "does not govern exclusively the appointment of district court judges." *Id.* at 341. Because Article IV, Section 10 expressly provides that "[v]acancies in the office of District Judge . . . shall be filled for the unexpired term *in a manner prescribed by law*," the General Assembly possessed constitutional authority to prescribe, by statute, how those vacancies would be filled. *Id.* at 340-41 (emphasis added). In other words, *Baker* reconciled Sections 19 and 10 of Article IV by recognizing that Section 10 "otherwise provided" a role for the General Assembly.

By contrast, no provision of Article IV "otherwise provide[s]" a role for the General Assembly in determining how vacancies on the Supreme Court and Court of Appeals are filled. For those offices, Article IV, Section 19 stands alone. Under *Baker's* logic, the General Assembly may not impose additional constraints by statute.

Article IV, Section 19 is not silent on whether the General Assembly may limit the Governor's choice of appointee to the appellate courts. It speaks directly by confining any limits on that choice to those "otherwise provided in" Article IV. The Judicial Vacancies Provision imposes a significant, new limitation found nowhere in Article IV. Accordingly, it exceeds the General Assembly's constitutional authority.

### 3. *Historical practice confirms the textual reading*

Historical practice, while not controlling, may illuminate the meaning of constitutional provisions. *See Baker*, 330 N.C. at 416. The history of judicial vacancy

14

appointments in North Carolina is consistent with the interpretation of Article IV, Section 19 outlined above and inconsistent with Legislative Defendants' position.

The people adopted a Constitution in 1868 that provided for the popular election of Supreme Court justices and vested the Governor with the power to fill judicial vacancies: "All vacancies occurring in the offices provided for by this article of this Constitution shall be filled by the appointment of the Governor, unless otherwise provided for, and the appointees shall hold their places until the next regular election." N.C. Const. art. IV, § 31 (1868). When Article IV was substantially revised, the people preserved this structure, again providing that vacancies in Article IV offices "shall be filled by appointment of the Governor" "[u]nless otherwise provided in this Article." N.C. Const. art. IV § 19 (1971).

When the General Assembly sought to impose the additional qualification that judicial officers be licensed to practice law in North Carolina, it did so not by statute but by proposing a constitutional amendment. *See* 1979 N.C. Sess. Laws, ch. 638, § 1 (H 1182) (proposing to amend Article IV to add Section 22). The voters accepted the proposed amendment, and Section 22 was added to Article IV. The General Assembly's choice reflects its understanding that for offices governed by Section 19, the Governor's appointment power is limited only by qualifications "otherwise provided in this Article," and that any new limit had to be added to Article IV itself.

Similarly, and more recently, when the General Assembly sought to fundamentally alter the process for filling judicial vacancies, it did so by proposing a

constitutional amendment to repeal Article IV, Section 19 and replace it with a different system. *See* N.C. Sess. Laws 2018-132, §§ 4-6. The General Assembly presented the amendment to the voters with the explanation that repealing Section 19 was necessary because "the Governor has sole appointment power" to fill judicial vacancies that occur between judicial elections:

> Constitutional amendment to change the process for filling judicial vacancies that occur between judicial elections *from a process in which the Governor has sole appointment power* to a process in which the people of the State nominate individuals to fill vacancies by way of a commission comprised of appointees made by the judicial, executive, and legislative branches charged with making recommendations to the legislature as to which nominees are deemed qualified; then the legislature will recommend at least two nominees to the Governor via legislative action not subject to gubernatorial veto; and the Governor will appoint judges from among these nominees.

*Id.* § 6 (emphasis added).

The voters rejected that proposed amendment in the 2018 general election. Legislative Defendants now argue that, notwithstanding their explicit acknowledgement to the voters, Article IV, Section 19 allows the General Assembly, by statute alone, to direct how appellate judicial vacancies must be filled. Legislative Defendants' present stance is incongruent with the General Assembly's prior acknowledgement, and the text and structure of Article IV do not support it.

The General Assembly's own statutory enactments also align with its previous acknowledgment to the people and my own reading of Article IV, Section 19. When

the General Assembly first enacted Section 163-9 in 1967, and when it later amended that statute to account for the creation of the Court of Appeals and various timing changes to elections, the General Assembly did not attempt to restrict the Governor's choice of appointee for appellate vacancies. It simply mirrored the Constitution's requirement that such vacancies "shall be filled by appointment of the Governor." N.C. Const. art. IV § 19. It also did not add a partisan list requirement for appellate courts in 1981 when it imposed such requirements for certain other offices, including district court judges, whose vacancies Article IV, Section 10 expressly provides for "in a manner prescribed by law." *See* 1981 N.C. Sess. Laws 763.

This longstanding practice of leaving the Governor free to choose from all constitutionally qualified attorneys when filling appellate judicial vacancies, coupled with the resort to constitutional amendment when the General Assembly sought to add new constraints, confirms that Article IV, Section 19 is understood as a limit on legislative authority.

## G. Conclusion

For these reasons, I conclude the Judicial Vacancies Provision impermissibly infringes on the Governor's appointment authority in Article IV, Section 19. I would therefore affirm the three-judge panel's order granting summary judgment to the Governor on the Judicial Vacancies Provision issue.